GALVESTON, HARRISBURG & SAN ANTONIO RAILWAY COMPANY V. WILLIS W. WALDO.

No. 5546.   Decided June 25, 1930.
(29 S. W., 2d Series, 323.)

*Baker, Botts, Parker & Garwood, John T. Garrison* ·and *Arterbury & Coolidge,* for appellant.

The facts proven on the trial of said cause, the material ones of which are substantially contained in the statement made to this Court by the Court of Civil Appeals, do not raise the issue of failure to furnish the appellee with a safe place to work as that duty has been defined and limited by decisions, and the principle that the master is under ·the positive duty to use ordinary care to furnish its servants with a safe place to work is not applicable to the facts proven. Nordhaus v. Vandalia Ry. Co., 89 N. E., 977; Kieffe v. Armour & Co., 101 N. E., 254; Coca Cola Co. v. Williams, 209 S. W., 396; Thurber Brick Co. v. Matthews, 180 S. W., 1189; Sherrill v. American Well· & Prospecting Co., 176 S. W., 658; S. A. & A. P. Ry. Co. v. Weigers, 54 S. W., 910; Corpus Juris, Vol. 39, Sec. 466–467.

The evidence is undisputed that the "place," as that term is used in the principle of law which the Court attempted to apply to the facts in this case in the issues submitted by it to the jury, was safe when used by the appellee and·his fellow servants for the purposes for which it was provided and for all acts required of appellee and his fellow servants within the scope of their employment. When a master provides such a place he has done all that the law requires of him.

If there is any liability attributable at all to appellant herein for the injuries alleged to have been received by appellee, it arises by reason of the actual knowledge of appellant's vice-principal, Doss, of the existence of the unauthorized practice of shooting clips and of his promise to see that the same was stopped, and of his subsequent failure to take any steps to have said practice stopped. Medlin Milling Co. v. Boutwell, 133 S. W., 1042; 34 L. R. A., (N. S.) 109.

*Fulbright, Crooker & Freeman, (W. B. Bates* and *T. H. Cody* of counsel) for appellee, cited and discussed: La Batt's Master and Servant, secs. 1515, 1517; Thurber Brick Co. v. Matthews, 180 S. W., 1189; Coca Cola Co. v. Williams, 209 S. W., 396; Sherrill v. American Well & P. Co., 176 S. W., 658.

It is apparent from the above authorities that the true rule is that where a place is unsafe by reason of the usual or customary conduct of employees and known by the master that the master will be liable for all damage occasioned thereby, which could have been reasonably anticipated in the same manner and to the extent as though the place was unsafe by reason of physical or structural defects.

The Trial Court gave a proper definition of negligence; the finding of the jury that the appellant was negligent in failing to furnish a reasonably safe place, in view of the definition of negligence, necessarily includes the finding that the practice was known to the appellant. The evidence will amply support such finding that the appellant had knowledge of such practice of shooting clips. Hence Article 2190 of the Revised Statutes 1925 and the authorities construing such article require that the judgment be affirmed.

MR. JUDGE CRITZ delivered the opinion of the Commission of Appeals, Section A.

### CERTIFIED QUESTIONS.

The case is before the Supreme Court on certified questions. Omitting formal parts the certificate is as follows:

"The cause is here on an undecided appeal by the Railway Company from a judgment in Waldo's favor against it, pursuant to a jury's verdict, as for its causative negligence as his employer in failing to furnish him—its employee—a reasonably safe place in which to do the work assigned him, the supporting pleadings and evidence deemed material for the purposes of the certificate being substantially as follows:

The appellee as plaintiff alleged:

"That plaintiff, at the time of his injury hereinafter complained of and prior thereto, was an employee of the defendant Railway Company in its office in the City of Houston, being employed as a clerk along with many others in said office to assist in doing the clerical work aforesaid, under the supervision, direction and control of E. R. Doss, agent and employee for defendant Railroad Company, designated as Chief Clerk of the floor or department in which this plaintiff was working at the time of his said injury, and who employed this plaintiff for and on behalf of said Railway Company.

"That on or about the 12th day of September, 1926, certain clerical employees of the defendant Railway Company working

on the floor and in the department with this plaintiff began to thump, throw or shoot with rubber, and propel in various manners, wire paper clips commonly used in such offices for fastening papers to-gether, which were thrown, shot and propelled with such force as to be dangerous to the employees in said department; that this plaintiff immediately informed the said E. R. Doss, Chief Clerk of said floor and under whom plaintiff was working and who had charge and control of said floor, of such conduct of said employees in throwing, propelling and shooting said paper clips and further of the fact of the danger that it subjected the employees to, and that the said E. R. Doss promised that he would put a stop to such action and conduct and to issue instructions against same, as it was his duty required him to, but negligently failed to do so; and that again on or about the 16th day of September, 1926, the said E. R. Doss having done nothing to stop the throwing, shooting, and propelling of such paper clips, one of the employees in said department, working near this plaintiff, was hit on the nose with a paper clip which had been shot, thrown and propelled through the air by some employee with such force that it penetrated his nose and caused same to bleed profusely; and that this plaintiff then and there again informed said E. R. Doss of such matter and further informed him that had the clip hit the employee in the eye it would have destroyed the sight of such eye, and informed him that if immediate steps were not taken to put a stop to such practice that some of the employees were going to be severely injured, and that he would no longer work under such conditions unless the said E. R. Doss, or someone else in authority, took some action to stop and prevent such practice; that again the said E. R. Doss informed this plaintiff that he would take immediate action to stop such practice and to issue instructions against same, and relying upon such promise of action on the part of said E. R. Doss this plaintiff again proceeded to his work; and on the next day, about the 17th day of September, 1926, while engaged in the performance of his duties as an employee of defendant, this plaintiff was hit in the eye by a paper clip, shot, thrown or propelled by someone of the clerical employees of the defendant Railway Company, working in such department, which clip was propelled with such force as to penetrate the eye ball of this plaintiff's right eye, causing plaintiff intense suffering and mental anguish; that plaintiff immediately informed the said E. R. Doss of the said injury; and was sent by the said E. R. Doss and other agents and employees of the said defendant Railway Company

for medical treatment, to the physicians designated as Company physicians; * * * this plaintiff finally sustained a complete loss of sight of the said right eye; and in addition thereto and as a direct result of said injury and the necessary suffering caused by the destruction of the sight of said right eye, the vision to this plaintiff's left eye has been greatly impaired, * * * .

"And although the said E. R. Doss had been twice informed by this plaintiff of the shooting, throwing and propelling of such paper clips by the employees on the floor under his charge and warned of the danger thereto to the employees, and though he had not been informed by this plaintiff, such practice of throwing, shooting and propelling of paper clips four or five days preceding this plaintiff's injury aforesaid, was of such a nature as was known to the said E. R. Doss or should have been known to him in exercise of ordinary care in the supervision of such employment; the said E. R. Doss, though he knew such practice and had promised to stop same, took no action whatsoever and issued no instructions to the employees to prevent the throwing, propelling and shooting of such paper clips until after the injury of this plaintiff as aforesaid, and that this plaintiff's said injury was directly caused by the negligence of the defendant Railway Company, its servants and employees in the following particulars:

"(a)  In failing and refusing to issue instructions to the employees with whom this plaintiff was working warning them of the danger of the throwing, shooting and propelling of such paper clips and instructing them to cease doing so, and to take such action as necessary to stop such practice—especially in failing and refusing to issue such instructions and to take such action after being requested to do so by this plaintiff and after promising this plaintiff to do so.

"(b)  In failing to furnish this plaintiff reasonably safe premises in which to work—especially after being informed by this plaintiff of the danger he was subjected to, in the course of his employment, by the flying paper clips; and the promises on the part of said defendant, its agents and employees under whom the plaintiff was working, that such danger would be eliminated.

"(c)  In failing and refusing to make reasonably safe rules for the regulation and governing of its employees with whom this plaintiff was working;

"(d)  In that its employee with whom this plaintiff was working, negligently and carelessly threw, shot and propelled a paper

clip in the direction of this plaintiff with such force that on striking this plaintiff in the eye, it penetrated the eyeball as aforesaid, causing this plaintiff the injury aforesaid."

"Appellant answered by demurrer and denial, both general.

"The plaintiff testified, in part:

" 'I was employed by the Revising Bureau on the second floor, in the clerical department, on the second floor of the Southern Pacific Building. * * * About six days before September 17, 1926, I nearly got hit in the eye and I was calling concentrations to another employee who was working the comptometer and was calling the figures out and we noticed clips and pins being thrown at us. Somebody would be throwing pins and first one thing and the other. A clip is about an inch long, it is made of wire. It was a piece of wire that holds papers together. I changed with Mr. Detrick and they kept coming on and I made a complaint to Mr. Doss, who is Chief Clerk under whom we worked, and I told him of it and he said he would have it stopped immediately and it went on for a few days and Mr. Shruptine got hit on the nose and I reported it the second time. When Shruptine got hit on the nose it cut the bridge of his nose, the second time this happened Mr. Struptine got hit on the bridge of the nose, he was working right opposite me. He broke in on his job about six months before I took it. He got hit after that, the second time Mr. Shruptine got hit on the bridge of the nose and it scratched his nose across there and it bled a little bit and I reported that accident to E. R. Doss and he said he would have it stopped and I said if it does not stop I am going to quit, and he said I will have that stopped immediately, and the next day I left my desk about twenty minutes of four to get a drink of water about thirty feet from my desk on the same floor and got to the drinking water and started to turn around and it hit me in the eye and I reached up to get it and it dropped out of my hand and I had to grab my eye, it liked to knocked me down and I stood there a minute and opened my eye and picked up the clip. I staggered around a moment, it liked to have knocked me down and I stood there a few minutes until I could see and stepped back to the desk and laid there a few minutes and Mr. Shruptine was sitting by me and he said what is the matter and I laid on the desk a few minutes, my eye was bleeding and I went up to Mr. Doss and showed him the clip and told him that was the third time I reported this and if I had known this was going to happen I would have quit there and he said go to the Doctor. This was the day Shruptine was hurt. * * *

"When I went to work for the Southern Pacific I was employed by E. R. Doss. He is the party to whom I reported about these clips being shot around. I did not see an order down there until after February when my eye was totally blind. I saw an order on the file. It stated any one caught shooting pins or clips on the second floor would be fired. This was in February of 1927. I do not have the order. * * *

"With reference to when did I first notice these clips being thrown around; in fact it was going on for a good while, about a year, and is still going on. I worked there and saw it going on. * * * I said it was going on until I quit. It was going on about a year or so before I quit. I could not say who was doing the shooting. There is one working there now named Clippie Gold, he is in the Southern Pacific Building. He has been working there and shooting those clips so long they named him 'Clippie Gold.' He was doing that for a long time. I have seen him pick out various objects. I knew it all the time. I first got shot something like six days before I got hit in the eye. I got hit on the right eye drinking at the fountain. The first time I got hit on my back and it landed on my desk. I was sitting down. Somebody got a clip and hit me on the back, and pins too. It was both of them. The first time I was hit pins and clips also hit me. The first time it was a clip. It hit me on the back. That was the first time I got hit, that was about six days before I was struck in the eye. I reported it the first time that something hit me in the back. I did not turn around and pick it up but I saw it on the floor back of me, various things that hit me. I did not pick it up, I could feel it. It hit me on the back. That is when I reported it, six days before I was struck in the eye. That is the first time I got hit prior to the injury. It was going on all the time. I got hit in the back. It did not bleed, there was a little sting and I looked around to see who did it, but I did not find out. I went straight to Mr. Doss. I did not tell him I was hurt, I told him I was calling out cotton concentration and that clips were hitting me on the back. I told him then. He said he would have it stopped. I did not get hit the second time I was working by the side of Mr. Shruptine. The next time I was hit in the eye. I was hit twice during the service there. The first time they hit me on the back and that was about six days before I was struck in the eye and I reported that. Mr. Doss said he would have it stopped. The next time I was struck in the eye. I reported that after I was hurt. He told me he would see it was stopped. I re-

ported the second time that Mr. Shruptine was struck. I am rather sure Mr. Shruptine reported it. I will not say he reported it to Mr. Doss, but I did.'

Plaintiff's witness Shruptine testified:

" 'I know Mr. Waldo. I worked there while he was there. I remember the occasion of his injury. Mr. Waldo was working with me at the time. I was struck with a pin a day or so before he was injured. I do not know where it came from. It came through the air. It hit me on the nose. I did not report it to Mr. Doss. I did not inform anyone I was struck. I do not think I informed Mr. Waldo I was struck. I do not remember if he was there with me when I was struck. My desk was about 50 feet from the water fountain and the only thing I could see was when you were going to get a drink there was two long tables I had to pass going down there. There was about 15 employes working at the table. I could not say what employes flipped the clip, there was always a bunch of them around this particular table, it was two long tables they worked on.

### CROSS EXAMINATION.

"I do not remember the names of anyone that did any of the flipping. I could not remember who it was. I know a pin hit me on the nose but I do not know where it came from. I do not know who did it. I never reported. * * * I made the statement that during the time I worked there I have known of pins and clips being flipped and thumbed from the table at some one. I stated this was not a frequent occurrence. I stated I did not see anyone flipping anything at the time of the injury to Mr. Waldo. I stated I did not know anything about how the injury occurred except what he told me when he returned to the desk. I remember the pin hit me on the nose. I never heard personally about anyone making a complaint to the head clerk about it. I did not myself.'

"Plaintiff's witness Chapman testified:

" 'I am Deputy Tax Assessor. I worked for the S. P. I know the plaintiff. I worked there while he was there. While I was working there and Mr. Waldo was working there I saw them shooting of clips around. It would be impossible for me to answer how many clips I saw shot around there. I do not know how hard they were shot but hard enough to hear them hit. I suppose they were being flipped where anyone else could see them, there was nothing secret about it.

CROSS EXAMINATION.

"With reference to who it was shooting the clips, that is another impossible question. I could not call any special name. If you want to find out who they were you will have to probably go up and find out. I don't know. I first saw the shooting of those clips after I started working there, about March of 1920; it was a prank between the employes, I do not think they were fighting. It was a prank. I shot some. When I shot them I did not want the head clerks or Chief Clerks to see me. I knew if they saw me it would go hard and they would bawl me out. When I did it I did not let the head clerks see me. I knew it would go hard if the head clerks saw me do it. I knew that would be under the rule of misconduct of the employes. * * * I was not working there in September, 1926. I was not working there when Mr. Waldo got hurt if it was that time. I quit in February of 1926. They did not fire me for shooting of the clips.'

"Plaintiff's witness Beach testified:

" 'I worked for the S. P. I do not remember the exact dates but it was about three years. I was working there when Mr. Waldo was, when he was injured. I resigned from the S. P. on the 23rd of October, 1927. I have seen the shooting of clips with rubbers while working there. I do not know how often it was. It was quite often. I remember the occasion of Mr. Waldo being injured. I remember the occasion of Mr. Shruptine being struck with a pin or clip a day or two before Mr. Waldo was injured. I do not know if anyone reported to Mr. Doss about Mr. Waldo being injured or Mr. Shruptine being injured. At the time Mr. Waldo was injured he showed me a clip. I was working 30 or 40 feet from Mr. Doss' desk. I saw Mr. Waldo show Mr. Doss something, but I would not say it was a clip. I heard of different ones being struck prior to the time Mr. Shruptine was struck, but I did not make any mention of it. I know Mr. Waldo was struck a couple of times to my knowledge. I saw him go to Mr. Doss. I saw him talking to Mr. Doss. I could not say what he was exhibiting to Mr. Doss, but he was talking to him and showed him something. I do not know anything of the time it was but I know about the last time when he was hurt. With reference to your question about the frequency or infrequency of this shooting, if it was any greater the last few days before Mr. Waldo was injured than it was prior to that time; my answer is "There was quite a number shooting those pins at that

time, there was a bunch of young fellows up there, I was struck several times myself." They were trying to hide it all the time from the bosses, and I do not know if the bosses could or could not see them. There was nothing more to obstruct their view that I know of, there was only one boss around me that could see, and that was Smith. I saw the place where Shruptine was struck on the nose, it was bleeding a little. Shruptine was angry and wanted to fight about it. He was talking to me about it but there was a bunch of employes there. I do not know if they heard it or not. They were within eight or ten feet. He was angry about it.

CROSS EXAMINATION.

"The boys were working there. I did not shoot any clips, but when I first went there I shot some. I did not shoot them where the head clerks could see me. I shot several under the desks to hit them on the legs and I did not want the bosses to see me. I did not want them to know who it was. I wanted to keep the fellows from knowing who it was.'

"Chief Clerk E. R. Doss, under whom the plaintiff worked, as well as several others of its head clerks, auditors and bureau chiefs, testified for the Railway Company, denying that they had ever seen, known of, or had reported to them, the shooting among or by the employes of any paper-clips in the office or department prior to September 17th of 1926, and saying that they had before that date issued no instructions against nor taken any other steps to stop such practice.

"Defendant's witness Ehrhardt testified:

" 'I worked for the S. P. for about eight years and was working there during the year 1926. I was rate clerk and was working on the second floor. I know Mr. Waldo, he was in the same room I was. I do not have any men under me. I have not seen any men shooting clips or pins of late in the office. I never saw any doing that in 1926. When I say of late I mean right after I started work for the S. P. in 1920. I have not seen it since 1924. No one has complained to me about clerks shooting clips or being shot.

CROSS EXAMINATION.

"I did not look to see how they did shoot clips when they shot them. I could not say they were shot. I saw them fall. They stopped it by instructing the men not to shoot clips. They were instructed in 1920 not to shoot clips. It was verbal. I received it with the rest of them; they stopped the practice.'

"In addition a number of other witnesses for the defendant testified, substantially, that no clips were shot by any of the employes within their knowledge, nor had any report been made to them of the practice of employes shooting clips at one another, and that it was their understanding that the rule of misconduct in effect in the office would apply to employes shooting clips, and under it they were subject to discharge.

"The trial court submitted these special issues to the jury:

" 'Special Issue No. 1.

"At the time and on the occasion in question, were the premises in which plaintiff was working a reasonably safe place in which to work?

"Answer "it was" or "it was not" as you find the facts to be.

"Special Issue No. 2.

"If you have answered Special Issue No. 1, "it was not," then answer:

"Was the failure of the defendant to furnish plaintiff a reasonably safe place in which to work negligence?

"Answer "it was" or "it was not" as you find the facts to be.

"Special Issue No. 3.

"If you have answered Special Issue No. 2, "it was," then answer the following:

"Was such negligence a proximate cause of plaintiff's injuries?

"Answer "it was" or "it was not" as you find the facts to be,' " which were answered favorably to the plaintiff, the defendant having at the time objected thereto in writing but making no request for the submission of any other or different ones, merely asking a peremptory instruction for stated reasons.

"Such being the state of the record:

"(1) Did the inquiries submitted by the Court embody such an issue of fact arising out of the pleadings and evidence as could, upon affirmative answers, properly constitute a predicate for liability?

"(2) Were the questions asked the jury a sufficient submission of the issue of negligence presented by the pleadings and evidence? "

OPINION.

It is disclosed by the certificate that the trial court submitted the case to the jury on special issues, and that the only ground of recovery submitted was whether the railway company had failed to furnish the appellee, Waldo, a safe place to work. The jury found that the railway company had failed to furnish such a place and that

such failure was negligence. The only evidence in the record which appellee contends sustains this finding is the practice of shooting paper clips, etc. by appellee's co-workers, who were working in the same room for the railway company. There is no contention that there was anything defective or unsafe about the building, premises, or room in which the appellee worked, or any tool, piece of furniture or appliance in the room. The undisputed evidence, according to the certificate, shows that appellee received his injury as the result of a prank, or willful or negligent act of one of his co-workers in the room.

It is our opinion that the rule of law requiring a railway company, in a case such as this, to furnish an employee a safe place to work has reference to the construction, equipment, and physical condition of the place itself, and not to the intentional or negligent acts of fellow employees. Galveston, H. & S. A. Ry. Co. v. Farmer, 73 Texas, 89, 11 S. W., 156; Wells Fargo & Co. v. Page, 68 S. W., 528, 29 Texas Civ. App., 489; Coca Cola Co. v. Williams, 209 S. W., 396 (Com. App. Opinion Approved); Nordhaus v. Vandalia R. Co., 242 Ill., 166, 89 N. E., 977; Keefe v. Armour & Co., 258 Ill., 28, 101 N. E., 254, Ann. Cases, 1914 B, 1881.

In G. H. & S. A. Ry. Co. v. Farmer, supra, it is held by our Supreme Court that "It is the duty of a railroad company to furnish safe tracks and machinery, and it is responsible to its servants for the neglect of this duty on the part of such servants or agents as it may intrust with its performance. Railway Co. v. Dunham, 49 Texas, 181; Railway Co. v. Whitmore, 58 Texas, 276." The court then proceeds to define the duty of the master with reference to selecting careful and skillful servants and right of action for injuries resulting on account of failure to exercise due care in such matter. Further along in the opinion the court says, "The car upon which the lumber was loaded, was neither defective in construction, nor out of repair. The negligence consisted in loading the lumber in an improper manner." A careful reading of the Farmer case convinces us that Judge Brown, who wrote the opinion intended to hold that the rule of law requiring the master to furnish the servant a safe place to work has reference to the construction and physical condition of the place of labor, and not, to the willful, wanton or negligent acts of co-workers. In other words, under this authority the right of action for failure to furnish a safe place to work is one ground of recovery, and the right of action for failure to exercise due care in the employment of other servants is another ground of recovery, but proof that the master was negligent in fail-

ing to prevent willful, wanton or negligent acts of co-workers resulting in injury would not sustain a recovery on a finding of "unsafe places to work."

In the Wells Fargo case, supra, the Court of Civil Appeals of this State for the 5th district, speaking through Justice Templeton expressly held that the duty to furnish a safe place to work, which an express company owes to an employee which such company had employed to ride on its cars, extends only to the construction and equipment of the car, and that loading express matter by another employee in a dangerous manner is not a breach of the duty to furnish a safe place to work.

In the Coca Cola case, supra, which is by the Commission and expressly approved by the Supreme Court, it is held:

"The duty of the master to exercise ordinary care to furnish and maintain a reasonably safe place is not breached by every negligent act, whereby the safe place furnished is rendered unsafe. To so hold would, in effect, make the master an insurer of the safety of the servant and abrogate the rule of nonliability of the master for an injury, the result of the negligence of a fellow servant. In almost every case involving the master's liability for injury to a servant, the safe-place doctrine could be successfully invoked. 'A place, in its broad sense, is never safe in which an accident happens, and an accident always happens in some place, and so the master might almost become an insurer.' Butler v. Townsend, 126 N. Y., 105, 26 N. E., 1017.

"This positive duty of the master has its rational and legal limits, which must be recognized and enforced. It is confined to construction or provision, and does not include operation or use. The duty is violated only when the negligent act resulting in injury pertains to the place in contradistinction to the use of the place. 'At the instant of the injury, every place * * * is unsafe. The test of liability is not the safety of the place nor of machinery at the instant of injury, but the character of the duty, the negligent performance of which caused the injury.' St. Louis, I. M. & S. Ry. Co. v. Needham, 11 C. C. A., 56, 63 Fed., 107, 25 L. R. A., 833; American Bridge Co. v. Seeds, 75 C. C. A., 407, 144 Fed., 605, 11 L. R. A. (N. S.) 1041. Was the duty one having to do with the preparation, construction, or maintenance of the place, or one pertaining to the operation or conduct of the business in or the use of the place? If the former, the master has breached his positive and nondelegable duty, and is liable for an injury resulting therefrom, whether the negligence be that of a vice principal or of

a fellow servant; if the latter, though he may be liable, his liability does not arise from a failure to furnish or maintain a safe place."

In the Nordhaus case, supra, the Supreme Court of Illinois holds:

" 'It is not contended that Zehak was guilty of any negligence whatever, and the plaintiff's evidence was sufficient to show that the flagman sent out to warn the incoming train was negligent, and that the appellant, through its servants, did not take reasonable precautions to prevent the stockyards train from running into the train on which the deceased was at work. It is urged, however, that the flagman was a fellow servant of Zehak, and that there could be no recovery for his negligence. The Appellate Court answered the argument on that subject by saying that it is the duty of a master to use reasonable care to provide a reasonably safe place for his servant to work, and that, if he attempts to perform that duty through another servant, he is responsible for his negligence, and applied that rule to this case. That rule of law was not applicable to the facts. Every event includes the element of locality as well as time and attending circumstances, but an injury occurring through negligence which does not render the premises defective or unsafe is not a breach of the duty to keep the place safe. If the place provided for a servant to work becomes unsafe through a failure to use reasonable care, the master is liable, and cannot relieve himself by saying that he committed the performance of his duty to another servant. But in this case there was no evidence that the place where the accident occurred was in any manner unsafe. There was no evidence tending to prove that the railroad yard was not physically safe, or that the rails or track were in any respect defective, or that the car or any appliance connected with it or any other car in the train or the engine was out of order or defective or unsafe in any particular.' "

In the Keefe case, supra, the same court announces the same doctrine in the following language:

" 'The charges of the declaration have already been stated, and they did not include any charge respecting a safe place to work or any breach of duty in that regard; and there was no evidence to sustain such a charge, if it had been made. The court gave to the jury, at the request of the plaintiff, the following instruction: "The court instructs the jury that it is the duty of the master to exercise reasonable care to furnish the servant with a reasonably safe place to work; and that this is a nondelegable duty and cannot be assigned to a servant, so that the master may escape liability on the ground of fellow servantship. It is the duty of the master to exercise

reasonable care to discharge that duty, whether he undertakes to perform that duty personally or through a servant."

" 'The rule stated was correct; but it relates to the condition of premises, buildings, and things which properly constitute a place for work. The rule is illustrated by various cases, such as Illinois Steel Co. v. Schymanowski, 162 Ill., 447, 44 N. E., 876, where a servant was required to work next to a dangerous pile of ore; Iroquois Furnace Co. v. McCrea, 191 Ill., 340, 61 N. E., 79, where a part of a dump pile had been removed so as to leave a perpendicular wall, making it dangerous for a servant to walk over it in the night time; Western Stone Co. v. Musical, 196 Ill., 382, 63 N. E., 664, 89 Am. St. Rep., 325, where the servant was required to load dirt into a wheelbarrow next to a perpendicular wall which was dangerous; Libby, McNeill & Libby v. Banks, 209 Ill., 109, 70 N. E., 599, where the defendant maintained a platform which made the place for the performance of the servant's duty dangerous; and Acme Harvester Co. v. Chittick, 230 Ill., 558, 82 N. E., 647, where there was a slippery hard-maple floor upon which the servant was required to stand. The duty includes the element of locality, and has no reference to anything except the keeping of the premises physically safe (Nordhaus v. Vandalia Railroad Co., 242 Ill., 166, 89 N. E., 974), and the rule could not possibly be applied to the facts of this case.' "

It follows from what we have said that both questions certified should be answered "No," and we so recommend.

Opinion of the Commission of Appeals answering certified questions adopted and ordered certified.

*C. M. Cureton,* Chief Justice.